**STATE**

v.

**Norman CIPRIANO, Jr.**

**State**

v.

**Jamie Bryant.**

Nos. 2009–56–C.A., 2008–60–C.A.

Supreme Court of Rhode Island.

June 27, 2011.

Virginia McGinn, Department of Attorney General, for State of Rhode Island.

Glen R. Whitehead, Esq., Providence, for Defendant Cipriano.

Janice Weisfeld, Office of the Public Defender, for Defendant Bryant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Chief Justice SUTTELL, for the Court.

The defendants, Norman Cipriano, Jr., and Jamie Bryant, appeal from Superior Court judgments of conviction for receiving stolen goods with a value in excess of $500 and for conspiring to commit larceny. On appeal, the defendants argue that (1) the trial justice erred in denying their motions for acquittal; and (2) the trial justice erred in his jury instructions concerning inferences and reasonable doubt. Mr. Cipriano additionally argues that (1) the trial justice erred in refusing to pass the case after a witness testified to seeing Mr. Cipriano on a prison bus; and (2) the trial justice erred in denying his motion for a new trial. For the reasons set forth in this opinion, we affirm the judgments of the Superior Court.

## I

### Facts and Procedural History

In June 2005, Mr. Cipriano and Ms. Bryant each was charged with: (1) fraudulently receiving stolen goods on or about April 15, 2005, including "perfumes and various pharmacy products, belonging to CVS, Brook's [Pharmacy,] and Bath & Body Works," with a value exceeding $500,

in violation of G.L.1956 §§ 11–41–2 and 11–41–5; and (2) conspiring together with one Diane Nicoletti, between March 1, 2005 and April 15, 2005, to commit larceny over $500, in violation of G.L.1956 § 11–1–6. The defendants were tried together before a jury in Superior Court in April 2007. The relevant evidence adduced at trial is set forth below.

In 2004 and 2005, Diane Nicoletti was shoplifting "[t]wo or three times daily" from Brooks Pharmacy, CVS, Walgreens, the Warwick Mall, and other malls, and she was selling the stolen items to support her drug habit. She testified that she shoplifted with Joseph Pari, Kimberly Carroll, and Gina Russo.[1] Ms. Nicoletti testified that around this time, Mr. Pari introduced her to Mr. Cipriano, and that Mr. Cipriano agreed to buy her stolen merchandise. She testified that in 2005, she met with Mr. Cipriano at least four times a week at either his house, his sports card shop, or outside his mother's house, to sell her stolen products. Ms. Nicoletti testified that she stole over-the-counter medications, including Zantac, Claritin, and Phazyme, as well as perfumes, lotions, and DVDs. She testified that Mr. Cipriano usually would pay her about a quarter of an item's value and that she occasionally had conversations with him about what to steal to ensure that she stole the items for which she would get the most value. Ms. Nicoletti explained that during this period, she also met and had contact with Mr. Cipriano's girlfriend, Ms. Bryant.

On February 25, 2005, Mark Pyne and Danielle Carolan, employees of a CVS in East Greenwich, became aware of two women in their store acting suspiciously.

---

1. Both Mr. Pari and Ms. Carroll similarly testified that they were stealing various items and selling them to support their drug habits.

Mr. Pyne testified that when the women approached the door, the alarm went off; when Mr. Pyne approached the women, they "started kind of jogging, running away," and Mr. Pyne followed in pursuit. During the chase, the women removed products from their jackets and dropped them on the ground.

On March 2, 2005, Ms. Carolan was working at a CVS in Coventry when she recognized two women in the store as being the same women involved in the East Greenwich incident. Ms. Carolan called the Coventry Police Department, and officers arrived soon thereafter. Upon arrival, Officer Matthew Carlos observed a female, later determined to be Ms. Carroll, removing perfumes from "the inside of her clothes" and putting them back on the store shelves; he seized these items, along with additional bottles of perfume that still were on her person. Meanwhile, Officer Matthew Blair observed another woman, later determined to be Ms. Nicoletti, also taking perfumes and colognes out of her sleeves and pockets; he similarly seized these items from her.

After being taken into custody, Ms. Nicoletti told Officer Blair that she was stealing the items to sell them to a "fence"[2] and that, knowing she had outstanding charges, she would give up this fence if she could avoid going to jail.[3] Officer Blair relayed this information to Detective Leo Fox, who met with Ms. Nicoletti on the evening of March 2, 2005. Ms. Nicoletti told Det. Fox about the alleged fencing operation and gave a written statement, detailing her activities. More specifically, Ms. Nicoletti reported that a man named "Norman" was the fence and that he lived in Warwick, had a sports card shop in Warwick, drove a white van, and dated a woman named "Jamie."

On March 3, 2005, Ms. Nicoletti accompanied Det. Fox and another detective to Warwick to identify Mr. Cipriano's house, his shop, and his mother's house. On the same day, Ms. Nicoletti also signed an informant agreement and entered into a cooperation agreement with the state. The cooperation agreement provided that if Ms. Nicoletti supplied truthful information about the fencing operation, assisted with the investigation, and testified, that in exchange the state would forgo presenting her as a violator on existing probationary sentences, release her on reasonable bail, and consider her cooperation in making its recommendation for sentencing on the March 2, 2005 shoplifting charge.[4]

Detective Fox testified that after meeting with Ms. Nicoletti, he "independently" verified that "a Norman Cipriano" lived in Warwick, that he owned a business there, and that he drove a white van with the license plate "AY–432." Detective Fox also spoke with members of the Warwick and West Warwick police departments and it was agreed that the plan was to have Ms. Nicoletti contact Det. Fox the next time that she was going out to shoplift for Mr. Cipriano. During the period from March 16 through April 14, 2005, Det. Fox and Ms. Nicoletti communicated by telephone; Det. Fox acknowledged that there were "gaps" when they lost contact. Ms. Nicoletti testified that she was stealing during these gaps. Nevertheless, on April

---

**2.** The officer explained that a "fence" is "an individual that receives stolen property and resells it for personal gain."

**3.** Ms. Nicoletti acknowledged, at trial, that she had several prior convictions for shoplifting, among other things, and that she was aware that she may have gone to jail for a long time.

**4.** Ms. Nicoletti was released on bail; she later pled guilty and was sentenced to five years, suspended, with probation.

14, 2005, Ms. Nicoletti called Det. Fox and told him that she was going out with Ms. Russo and Ms. Bryant in a white Dodge Stratus, with the license plate "NN–820," to steal from the Warwick Mall and from Brooks pharmacies in Coventry. Detective Fox "ran" the license plate "NN–820" and determined that a car with that plate number was registered to Ms. Bryant.

Around 7 p.m., on April 14, 2005, Warwick police took up surveillance both inside and outside the Warwick Mall; a detective inside the mall soon located Ms. Nicoletti and Ms. Russo. Ms. Nicoletti testified that she and Ms. Russo went to the Bath & Body Works in the mall, where they stole "[q]uite an abundance" of perfumes, including Henri Bendel perfumes. Ms. Nicoletti testified that afterward, they returned to Ms. Bryant's car and had a conversation with Ms. Bryant about what they had done. Meanwhile, Detective Mark Perkins and his partner, Detective Steven Forde, who were outside the mall in an undercover vehicle, observed a white Dodge Stratus bearing the license plate "NN–820," with "a subject sitting in the * * * driver's seat." Detective Perkins testified that he and Det. Forde then observed two females leave the mall and enter this vehicle, and the detectives watched the vehicle drive away.

The police surveillance team proceeded to follow the vehicle for the rest of the evening. Sergeant Michael Forde, Detective John Toussaint, Det. Perkins, and Det. Forde all followed the vehicle from the Warwick Mall to a CVS on Providence Street in West Warwick, where it arrived at 7:28 p.m. Sergeant Forde observed two females exit the vehicle and enter the store. After "five or ten minutes," the females left the store and returned to the car. The police then followed the vehicle as it went to a CVS located on Main Street in West Warwick, arriving at 7:40 p.m.

Detective Perkins testified that two of the three people again exited the car and went into the store, where they remained for approximately ten minutes before returning to the same car. The surveillance team then followed the vehicle as it went to another CVS on Main Street in West Warwick, arriving at 7:55 p.m. Detective Perkins testified that once again he observed the driver remain in the car while two females exited the car, entered the store, and then returned to the vehicle after "a couple of minutes."

Ms. Nicoletti testified that, on April 14, 2005, she stole products, including Zantac, Claritin, Phazyme, and Senokot, from two of the three CVS stores. She testified that she did not steal from one of the CVS stores because she "got nervous." Ms. Nicoletti further testified that after she and Ms. Russo stole from the stores, they would return to the car and "would say whether or not [they] did well in the store."

Detective Perkins testified that after the vehicle left the CVS on Main Street in West Warwick, it drove across the street to a Honey Dew Donuts parking lot. Ms. Nicoletti then called Det. Fox and reported that she was going to one more store—the Brooks Pharmacy in Coventry. Detective Fox accordingly directed certain officers to pick up surveillance and arranged for others to set up surveillance at Mr. Cipriano's home. Detective Michael Dicomitis testified that he followed the car from the Honey Dew Donuts to the Brooks Pharmacy in Coventry, where he observed two females exit the vehicle and enter the store. Meanwhile, Det. Fox had gone to the Brooks Pharmacy and had spoken with its manager, Diane Tetreault. With Ms. Tetreault's permission, Det. Fox had entered the manager's booth. Detective Fox testified that, from the manager's booth, he observed Ms. Nicoletti and Ms. Russo

enter the store, and he saw Ms. Nicoletti take items from the pharmaceutical aisle and hide them in her coat. Ms. Russo made a purchase, and then both women proceeded to leave, at which time the alarm went off. Ms. Russo returned to the counter, showed the clerk her shopping bag, and then proceeded to leave again; meanwhile, Ms. Nicoletti had exited the store.[5] Ms. Nicoletti testified that she stole Phazyme, Zantac, Claritin, and Senokot from this Brooks Pharmacy.[6]

The surveillance team then followed the white Dodge Stratus from the Brooks Pharmacy to Mr. Cipriano's house in Warwick. Detective Perkins testified that he observed as the car arrived and as three occupants exited the car and walked up to the house. Detective Fox testified that he then received another phone call from Ms. Nicoletti, who said that she, Ms. Russo, and Ms. Bryant were waiting for Mr. Cipriano to come home. Detective Fox communicated this update to the surveillance team. In response, Sgt. Forde went to Mr. Cipriano's store, outside of which he observed a parked white van with the license plate "AY–432." Sergeant Forde testified that this vehicle departed around 8:45 p.m. and that he followed it to Mr. Cipriano's house. Ms. Nicoletti testified that, once Mr. Cipriano arrived at his house, the stolen items were counted, and that he paid her for them in cash. Ms. Nicoletti testified that she then gave some of that money to Ms. Russo for her participation and some of it to Ms. Bryant for driving.

Detective Perkins testified that, some time after Mr. Cipriano arrived at his house, the detective saw three people leave the house and drive away in the white Dodge Stratus. Ms. Nicoletti called Det. Fox after she was dropped off at her home. Detective Fox met with Ms. Nicoletti, at which time she told him what had happened and provided a written statement. Ms. Nicoletti also gave Det. Fox $38; she reported that Mr. Cipriano had paid her $350, but that she had split the money with Ms. Bryant and Ms. Russo and had spent some to "g[e]t high."

On the next day, April 15, 2005, police officers spoke with Richard Ledo, a manager of the CVS on Providence Street in West Warwick. Mr. Ledo checked the store inventory and discovered that five boxes of Zantac and five boxes of Phazyme were missing. Elaine Vorro, a manager of the CVS on Main Street in West Warwick, also conducted an inventory, after her coworker spoke with the police, and she determined that five boxes of Zantac and "two to three" boxes of Phazyme were missing. However, neither Mr. Ledo nor Ms. Vorro were able to determine exactly when the items had gone missing.

Also on April 15, 2005, a search warrant for Mr. Cipriano's house was issued and executed. Barbara Frazier, a property officer for the Warwick Police Department, was responsible for photographing, documenting, and collecting evidence in this case. One area searched was a bedroom on the lower level. Significantly, the room contained both male and female clothing. The police found and seized the following: (1) personal documents, including a checkbook, bank statements, and a receipt, all in Ms. Bryant's name, an envelope addressed to Ms. Bryant, and paperwork belonging to Mr. Cipriano; and (2) a variety of trial-

---

5. Ms. Nicoletti explained at trial: "sometimes we would have the person that went in with us buy merchandise and once they flagged it over the beeper machine, we would then put another beeper on it so when we walked out, I would continue to leave, and they would go back to the register."

6. The store, however, was unable to determine what, if anything, was taken.

sized perfumes and colognes. The police also searched a "laundry room storage" area, located on the lower level of Mr. Cipriano's house, where they found and seized DVDs, some with CVS price tags, boxes of Zantac, Phazyme, Claritin, Alavert, and Remifemin, eye drops, and assorted colognes. The police also searched an office on the lower level of the house, where they discovered stacks of products covering the floor. Detective Toussaint testified that there were "[t]housands of items that were spread in the room like a gift shop." The items found in the office were stacked, separated, counted, and seized. The seized items included: boxes of Primatene Mist inhaler refills, some with CVS security stickers on them; over-the-counter medications, including Ducolax, Priolosec, Zantac, and Senokot, some bearing CVS price tags and security labels; assorted Tutti Dolci perfumes and lotions; assorted Henri Bendel perfumes and soaps; other assorted perfumes and colognes; assorted makeup items; a box of toothbrush replacement heads; and Spider–Man 2 DVDs that were closed, with CVS price tags on them. The police also discovered a crawl space in the office of the house, where they found and seized a basket of Remifemin, a bag of "well over a hundred" Oral–B toothbrush replacement heads, and a box containing United States Postal money orders and cash.[7]

At trial, Ms. Nicoletti could not confirm whether the items seized were the exact items that she personally had stolen because she had not marked them; she did, however, testify that the boxes of Zantac, Senokot, Phazyme, and Claritin, and the Bath & Body Works perfumes were of the same type as the items that she had stolen.

Officer Frazier testified that during the search of Mr. Cipriano's office, a detective "either bumped or rested on the computer desk," which caused the computer screen to come on and reveal an eBay screen.[8] Kyle Kettelle, a detective in the Computer Forensics Unit of the Warwick Police Department, testified that, upon examining the computer's hard drive, he determined that multiple eBay usernames had been used on it, including "King of Deals 24," "Norm'[s] Better Deals," "Mill Dog 16," and "Harkenman," and that Mr. Cipriano's and Ms. Bryant's names were associated with these accounts. David Carlson, a Fraud Investigation Supervisor for eBay, testified that Mr. Cipriano indeed had "multiple accounts" associated with his name, which had the usernames "Norms-BetterDeals," "Norms–Better–Deals," and "Harkenman," and that Ms. Bryant had an account under her name, which had the username "Milldog16" and listed Mr. Cipriano's home address. Detective Kettelle testified that there were "over a thousand" eBay pages visited on the computer and that the pages "predominately" listed items offered for sale. Mr. Carlson testified that, between January 1, 2005 and March 25, 2005, items were listed for sale under Mr. Cipriano's accounts; the items included pharmaceuticals, Oral–B toothbrush heads, various perfumes, and Bath

---

7. While searching Mr. Cipriano's house, the police also found a receipt for priority mail postage, credit card receipts of products sold, other business-related receipts, and three CVS receipts. Officer Frazier testified, however, that the CVS receipts were from 2003 and 2004, and they were for the purchase only of rubber bands, a scraper, "some 99–[c]ent items," and assorted Valentine's Day items.

8. eBay was described as an "[i]nternet-based a[u]ction site" that serves as "an online global marketplace similar to a newspaper classified ad where any member throughout the world can come and post items for sale."

& Body Works products.[9]

While police officers were executing the search of Mr. Cipriano's house, Ms. Bryant arrived. Officer Alfred Melucci, Jr., testified that he asked Ms. Bryant what she was doing there and that she replied that "it was her house." The officer transported Ms. Bryant to the police station, where Det. Toussaint interviewed her. Detective Toussaint testified that Ms. Bryant told him that she had known Mr. Cipriano "for a very long time," had been dating him "for about a year," and had been living with him "for about three months." Detective Toussaint testified that he then asked her why she had listed a different address on her constitutional rights form, which she had filled out when she arrived at the police station; according to the detective, she said that the listed address was where her sister and mother lived, and that, although she stayed there "from time to time," most of her belongings were located at Mr. Cipriano's house, which she considered to be "her home address." Detective Toussaint testified that when he asked her where all the products in the house came from, she said that the items in the bathroom belonged to her, but that "she had no idea where [the products in the office] came from or why they were there."

On April 16, 2005, police officers executed a search warrant for a shed at Mr. Cipriano's parents' house, where they found and seized more Oral–B toothbrush replacement heads. On the same day, the police also executed a search warrant at Mr. Cipriano's shop. During this search, they found and seized three boxes of Henri Bendel perfume and receipts from the Raynham flea market, which appeared to be for a booth or a table that Mr. Cipriano had there.

Later, William John Shea, a field manager in the Organized Retail Crime Unit of CVS, met with the police and used a scanner to determine which of the seized items were sold in CVS stores. Mr. Shea scanned 3,172 pieces of evidence and determined that, of those, 2,743 were carried by CVS. Mr. Shea generated a report that listed these products and reported their total retail value as $60,405.20. Although Mr. Shea confirmed that the products were carried by CVS, he could not determine whether the products were stolen. Shelly Lariviere, a sales leader at Bath & Body Works, also met with the police and testified that the Henri Bendel and Tutti Dolci perfumes that were seized from Mr. Cipriano's house were carried by Bath & Body Works in April 2005.

At trial, Mr. Pari testified that he stole with Ms. Nicoletti and Ms. Carroll, and that in 2005 he "kn[e]w a guy named Norman" and went to his card shop with Ms. Nicoletti and Ms. Carroll. Ms. Carroll testified that she knew Mr. Cipriano and Ms. Bryant, that Mr. Cipriano was a family friend, and that she had been to his card shop, his home, and his mother's home.

Mr. Cipriano testified in his own defense. He testified that he did have a store in Warwick named "Norm's Better Deals," which he opened in 1998 to sell sporting goods. He testified that in 1999, he joined eBay to sell some of the items that were at the store and to make purchases for his store; he confirmed that he had several eBay accounts and testified that he had used Ms. Bryant's personal information to open one of the accounts. He further testified that he also had begun selling additional items, including DVDs,

---

9. Mr. Cipriano testified that he did not sell anything on eBay after March 25, 2005, because he was suspended for "sh[i]ll bidding," which he said is "when you have a friend or somebody else online bid on your items to [artificially inflate] the price."

over-the-counter medications, perfumes, and colognes on eBay, at a flea market, and at his store. He testified that he purchased these items on eBay, at a flea market, and at a CVS warehouse outlet, and that "[he] bought everything that was in [his] house, * * * at one time or another."

Mr. Cipriano further testified that Ms. Bryant was his girlfriend and that in April 2005 she had clothes in his bedroom, stayed overnight, and used his address as her own; he added that they had a joint bank account. Mr. Cipriano also said, however, that Ms. Bryant did not have a key to his house and that "she wasn't living with [him]." He testified that she "occasionally helped [him] at the flea market" and the store, but that she never was present when he purchased items "outside the flea market," and that she did not help with his internet business. Mr. Cipriano confirmed that in 2005, Ms. Bryant drove a white Dodge Stratus with the license plate "NN–820."

Mr. Cipriano testified that, on April 14, 2005, nobody was at his house when he returned from work at around 8:45 p.m. He testified that a few minutes later, Ms. Bryant and her sister were dropped off in a white Dodge Stratus by their mother, and that they both slept over at the house. Mr. Cipriano testified that he had never met Ms. Nicoletti, that he had never spoken to her on the telephone, and that she "[a]bsolutely" had never been in his house. He further testified that he recognized Mr. Pari and Ms. Carroll from the flea market, but he said that he never purchased any items from either of them. Finally, Mr.

Cipriano testified that he had "never told anybody in [his] life to go out and steal."

At the conclusion of the trial, the jury found defendants guilty on both counts. A hearing later was held on a motion for a new trial, under Rule 33 of the Superior Court Rules of Criminal Procedure, which the trial justice denied. On June 29, 2007, the trial justice sentenced Ms. Bryant to a term of two years, with six months to serve in the community confinement program and the balance suspended, with probation, for each count, running concurrently. On the same date, the trial justice sentenced Mr. Cipriano to a term of ten years, with six years to serve and the remaining four years suspended, with probation, for each count, running concurrently. Final judgments of conviction were entered on July 16, 2007, from which defendants timely appealed.[10]

Additional facts will be supplied as needed.

## II

## Discussion

### A

### Motion to Acquit

On appeal, both defendants argue that the trial justice erred in denying their motions for judgment of acquittal. The defendants had moved for judgments of acquittal, on both charges, at the conclusion of the state's case and again at the close of all the evidence, in accordance with Rule 29 of the Superior Court Rules of Criminal Procedure.[11]

---

10. Although Mr. Cipriano filed his notice of appeal before final judgment was entered in this case, this Court will treat the premature appeal as timely filed. *See Otero v. State,* 996 A.2d 667, 670 & n. 3 (R.I.2010).

11. Rule 29(a)(1) of the Superior Court Rules of Criminal Procedure states, in pertinent part:

"The court on motion of a defendant or on its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment, informa-

After hearing the parties' arguments, the trial justice reprised the relevant evidence and concluded that:

> "based upon all of the 21 witnesses who have appeared here before the Court, the Court believes that this evidence, if believed, could certainly justify a finding of guilty against both defendants both for receiving * * * stolen goods since there is no question if [Ms.] Nicoletti is believed that she stole goods and conveyed them to both defendants and, also, with regard to the conspiracy through the testimony of [Ms.] Nicoletti and the subsequent actions of both [Ms.] Bryant and Mr. Cipriano with regard to her and the goods that were conveyed by her."

The trial justice accordingly denied the motions.

### 1. Standard of Review

 "Whenever this Court reviews the denial of a motion for judgment of acquittal, we apply the same standard as that applied by the trial justice; namely, we 'must view the evidence in the light most favorable to the state, * * * giving full credibility to the state's witnesses, and draw therefrom all reasonable inferences consistent with guilt.'" *State v. Ros*, 973 A.2d 1148, 1159 (R.I.2009) (quoting *State v. Caba*, 887 A.2d 370, 372 (R.I.2005)). "This Court must evaluate just the evidence 'that the prosecution claims is capable of supporting proof of guilt beyond a reasonable doubt.'" *State v. Reyes*, 984 A.2d 606, 616 (R.I.2009) (quoting *Ros*, 973 A.2d at 1159). "'If that examination reveals sufficient evidence to warrant a jury verdict of guilt beyond a reasonable doubt,' the trial justice's denial of the motion should be upheld." *State v. Cardin*, 987 A.2d 248, 250 (R.I.2010) (quoting *State v. Oliveira*, 882 A.2d 1097, 1108–09 (R.I.2005)).

### 2. Receipt of Stolen Goods

On appeal, both defendants argue that the trial justice should have granted the motions for judgment of acquittal because the evidence produced at trial was legally insufficient to establish the receipt of stolen goods under § 11–41–2. Section 11–41–2 provides:

> "**Receiving stolen goods.**—Every person who shall fraudulently receive any stolen money, goods, securities, chattels, or other property, knowing it to be stolen, shall be deemed guilty of larceny, although the person who stole the property may not have been prosecuted or convicted for it. The possession of any stolen property shall be evidence of guilty knowledge by the person having possession that the property was stolen, unless the person shows that it was acquired in the due course of trade and for adequate consideration."

 On appeal, defendants argue that the state failed to prove that any of the items produced at trial actually were stolen. They maintain that the state could prove only that the items were similar to, or of the same type as, the items stolen from the various stores because they lacked any unique or identifying characteristics. We disagree. Rather, we are of the opinion that consumer products that are mass produced, and thus devoid of any unique identification markings, may be established as stolen property by circumstantial evidence concerning the amount, kind, and nature of said property. We find the following language of the Supreme Judicial Court of Maine to be particularly instructive:

> "[P]roperty comprehended within a general class of standardized consumer

tion, or complaint, after the evidence on either side is closed, if the evidence is insuf-

ficient to sustain a conviction of such offense or offenses."

products may be adequately proved stolen, even though it lacks 'personal marks' or other characteristics of unique differentiation, so long as the totality of the evidence, circumstantial or otherwise, yields other bases by which identification is shown beyond a reasonable doubt." *State v. Bickford*, 308 A.2d 561, 565 (Me.1973).

*See also Alldredge v. State*, 431 So.2d 1358, 1361 (Ala.Crim.App.1983) (evidence regarding "the amount, kind and nature of the property stolen with similar characteristics of the property found may supply the necessary identification" (citing 50 Am. Jur.2d *Larceny* § 158 (1970), presently at 50 Am.Jur.2d *Larceny* § 139 (2006))); *Beasley v. Commonwealth*, 339 S.W.2d 179, 180 (Ky.Ct.App.1960) (whether the evidence is sufficient to identify the property as stolen "depends upon the nature of the thing taken and the circumstances connected therewith").

Here, Ms. Nicoletti testified that she stole Zantac, Phazyme, Senokot, Claritin, and various Bath & Body Works perfumes on April 14, 2005, and that she sold these items to Mr. Cipriano. At Mr. Cipriano's house, the police indeed found thousands of items, including over-the-counter medications and perfumes, that were spread out "like a gift shop." Ms. Nicoletti testified that the products seized from Mr. Cipriano's home were the same kind as those she had stolen and sold to him. We are satisfied that this evidence was sufficient to raise a reasonable and logical inference that the goods found in Mr. Cipriano's home were the same goods that were stolen by Ms. Nicoletti. The trial justice properly found that the fact that the allegedly stolen items were not unique in nature, or somehow marked, was not fatal to the state's case, and he properly denied defendants' motions for judgment of acquittal.

Ms. Bryant further argues that the state failed to establish that she actually "possessed" any of the allegedly stolen goods found in Mr. Cipriano's home. "It is well established that 'possession of an object can be either actual or constructive.'" *State v. Mastracchio*, 672 A.2d 438, 448 (R.I.1996) (quoting *State v. Jenison*, 442 A.2d 866, 875 (R.I.1982)). This Court stated in *State v. Motyka*, 111 R.I. 38, 40–41, 298 A.2d 793, 794 (1973), that "[c]onstructive possession arises where an individual has dominion or control over an object although it may not be within his immediate physical possession." "The determination that an individual has the requisite dominion or control is a legal conclusion to be based on all the facts and circumstances presented." *In re Malstrom*, 115 R.I. 208, 209, 341 A.2d 437, 438 (1975).

Ms. Bryant concedes that she "had been sharing the older Mr. Cipriano's bed and bath," but argues that "all of the allegedly stolen items were found in areas of [his] home that were exclusively under his dominion and control." Ms. Bryant, however, did more than just share a bed and bath with Mr. Cipriano; evidence showed that she kept clothes at his house, she received mail there, and that she declared to a police officer that it was where she actually lived. Considering that Ms. Bryant did have clothes at the home, one reasonably could infer that she used the laundry room, where some of the products were found. Additionally, Ms. Bryant had an eBay account under her name that had been used on the computer in the office, where many products were found. We are of the opinion that the overall evidence presented in the instant case, viewed in the light most favorable to the state, was sufficient to establish a finding that Ms. Bryant did have constructive possession of the items, and that, thus, the trial justice

did not err in denying the motion for acquittal on this basis.

■ Ms. Bryant finally argues that, even if the items were stolen and she was in possession of them, the state failed to prove that she had the requisite knowledge concerning the stolen nature of the items. However, Ms. Nicoletti testified that Ms. Bryant drove her and Ms. Russo around to shoplift, conversed with Ms. Nicoletti and Ms. Russo about how they "made out" in the stores, was at Mr. Cipriano's house when he paid for the stolen goods, and even shared in the proceeds. Furthermore, Det. Toussaint testified that Ms. Bryant admitted to him that she lived in Mr. Cipriano's house, where the enormous quantity of products were found. Ms. Bryant's assertions of ignorance as to the nature of these products do not justify the granting of the motion for judgment of acquittal. Rather, in viewing the evidence in the light most favorable to the state, we find that the evidence is more than sufficient to support a finding that Ms. Bryant was aware of the stolen nature of the goods.

■ Finally, Mr. Cipriano argues that the state did not present sufficient evidence concerning the value of the items allegedly stolen on the dates in question and thus failed to establish the charge of receiving stolen goods over $500. This Court observes, however, that Ms. Nicoletti testified that Mr. Cipriano normally paid her a quarter of the retail value of the stolen items, and that Ms. Nicoletti reported to Det. Fox that she had received $350 for the goods she stole; a reasonable inference drawn from this testimony is that the stolen items were worth over $500. Furthermore, it is noted that a CVS field manager reported that the goods found and seized at Mr. Cipriano's home were worth a total retail value of $60,405.20. This evidence was sufficient for denying defendant's motion for judgment of acquittal.

### 3. Conspiracy

On appeal, both defendants also argue that the evidence produced at trial was legally insufficient to prove that they conspired to commit larceny with Ms. Nicoletti, and thus the trial justice erred in denying their motions for acquittal.

"Conspiracy is defined as a combination of two or more persons to commit an unlawful act or to perform a lawful act for an unlawful purpose." *State v. Mastracchio*, 612 A.2d 698, 706 (R.I.1992). Once the conspiracy agreement is made, the offense is complete; no other action in furtherance of the conspiracy is required. *State v. Brown*, 486 A.2d 595, 601 (R.I.1985); *State v. Barton*, 427 A.2d 1311, 1312–13 (R.I. 1981). "Because it is difficult to prove in complete detail the explicit terms of conspiracy agreements, the goals of the conspirators 'may be inferentially established by proof of the relations, conduct, circumstances, and actions of the parties.' " *Mastracchio*, 612 A.2d at 706 (quoting *State v. Gordon*, 508 A.2d 1339, 1349 (R.I.1986)).

■ Ms. Bryant specifically argues that "the state failed to prove that [she] was anything other than an aider and abettor to the shoplifting conspiracy." We, once again, observe that Ms. Nicoletti testified that Ms. Bryant drove her and Ms. Russo around from store to store to shoplift, that Ms. Bryant conversed with Ms. Nicoletti and Ms. Russo about what they had done in the stores, and that Ms. Bryant shared in the proceeds at the end of the night. Furthermore, testimony revealed that one of the eBay accounts used on the computer at Mr. Cipriano's house, where many goods were found, was under Ms. Bryant's name. Such evidence, viewed in the light most favorable to the

state, supports a finding that Ms. Bryant did more than just aid in the illegal activities, and rather that she was part of the agreement to commit larceny. Thus, the trial justice properly denied defendant's motion for judgment of acquittal on this count.

■ Mr. Cipriano argues that there is no evidence to suggest that he ever asked Ms. Nicoletti to steal for him, and that there is no evidence of an agreement to commit larceny. We are satisfied, however, that the evidence presented at trial, viewed in the light most favorable to the state, manifestly suggests an agreement between Mr. Cipriano, Ms. Bryant, and Ms. Nicoletti to shoplift. Ms. Nicoletti testified that she occasionally would ask Mr. Cipriano what to steal, that she notified him before going out to steal, that his girlfriend, Ms. Bryant, drove them around to different stores to steal, and that he met with Ms. Nicoletti as often as four times a week to buy the stolen items. This testimony, combined with the rest of the extensive testimony, easily could be viewed as evidence that defendant and Ms. Nicoletti indeed were scheming to commit larceny. Therefore, we find no error in the trial justice's denial of defendant's motion for judgment of acquittal.

### B

### Jury Instructions

Both defendants also argue on appeal that the trial justice erred in refusing to instruct the jury about impermissible pyramiding of inferences, and that the trial justice erred in his charge concerning proof beyond a reasonable doubt.

### 1. Standard of Review

■ "We undergo a review of jury instructions on a *de novo* basis." *Ros,* 973 A.2d at 1166. "It is well established that,

'[o]n review, we examine [jury] instructions in their entirety to ascertain the manner in which a jury of ordinary intelligent lay people would have understood them.'" *Id.* (quoting *State v. Ibrahim,* 862 A.2d 787, 796 (R.I.2004)). "[This Court] shall affirm a trial justice's jury instructions when * * * the instructions adequately cover the law and neither reduce nor shift the state's burden of proof." *State v. Linde,* 876 A.2d 1115, 1128 (R.I. 2005) (quoting *State v. Keiser,* 796 A.2d 471, 472 (R.I.2002) (mem.)); *see also State v. Gautier,* 950 A.2d 400, 415 (R.I.2008). "The trial justice need not use particular words in the instruction, but must 'correctly state[] the applicable law.'" *State v. Imbruglia,* 913 A.2d 1022, 1030 (R.I.2007) (quoting *State v. Mastracchio,* 546 A.2d 165, 173 (R.I.1988)). Furthermore, a "trial justice's refusal to grant a request for jury instruction is not reversible error if the requested charge is fairly covered in the general charge." *State v. Price,* 706 A.2d 929, 934 (R.I.1998) (quoting *Taylor v. Allis Chalmers Corp.,* 610 A.2d 108, 109 (R.I. 1992) (mem.)).

### 2. Inferences

On appeal, defendants argue that the trial justice erred in denying their requests to provide the jury with instructions about: (1) drawing an inference of innocence when there are competing inferences; (2) not speculating; and (3) not pyramiding inferences.

■ Pertaining to inferences, the trial justice instructed the jury that:

"You may draw from the evidence that you believe to be true any reasonable inferences which you think you should be able to draw from that evidence which I'll explain more fully in a moment. You must, however, consider only the evidence on the record * * *.

"It is important to note that you are not called upon to solve a mystery or resolve a detective story. That is not your function at all. You are called upon to determine whether or not the evidence you heard in this Court and the reasonable inferences drawn from that evidence that you believe to be true prove either of these or both of these defendants guilty beyond a reasonable doubt.

"Now, as I said to you, the evidence in this case consists of the oral testimony given under oath by the various witnesses who have appeared here, some 22 witnesses and from the exhibits that have been marked as full exhibits. * * * You will not have the identification only exhibits in the jury room with you because they are not exhibits. You may, however, draw from the testimony regarding them whatever you believe to be important * * *.

"You may also decide this case not only based on the eye-witness or direct evidence that you heard from the witnesses stand or by the real or tangible evidence from the clerk's desk, you may also have a fact of a charge or a case proved to you by what we call proof by inference. An inference is a conclusion which your mind accepts as true because your reason tells you that it's true because of other facts which you know are true.

"A simple example I'll point out, which is a proof by inference, * * * [is] suppose you go to bed tonight, you look out your bedroom window and you see whatever it is you see there, * * * and * * * there is no snow on the ground. You wake up tomorrow morning, look out the same window * * * and lo and behold there is a snowfall covering that same area.

"Well, you didn't see it snow during the night, so you have indirect testimony that it snowed during the night, but you do know from the two facts that you are sure of, no snow at night, snow in the morning that you can reasonably infer that it snowed during the night. If one of your colleagues came in tomorrow morning and said, 'Gee, I got up at 2:00 in the morning, looked out my bedroom window and saw a beautiful snowfall, well, now you have direct or eye-witness testimony that it snowed during the night. But you don't need that. It's already been proved to you by reasonable inferences that you may draw from other facts or circumstances you believe to have been proved to you in this case.

"Under our law, ladies and gentlemen, any fact that is proved to you either by direct or eye-witness testimony, by real or tangible evidence or proof by inference weighs the same in our law. There is no hierarchy of proof. No one form of proof is stronger or better than the other."

Shortly after, while instructing the jury about reasonable doubt, the trial justice further explained that "[m]ere suspicion, however strong, cannot sustain or justify a verdict of guilty."

After instructing the jury, the trial justice held a sidebar conference at which Ms. Bryant's counsel objected to the instructions concerning inferences. Mr. Cipriano's counsel joined in this objection, and it was requested that the trial justice issue "an instruction about not engaging in speculation or conjecture" and "something to the effect that * * * if there is another inference which can be drawn apart from an inference being consistent with guilt, then [the jury] may not draw that inference consistent with guilt." The defendants' counsel proceeded to refer to *In re Derek*, 448 A.2d 765 (R.I.1982), and the

other "cases that talk about the pyramiding of inferences." The trial justice declined to give the requested instruction concerning inferences and explained that he already had "said[ ] [that] mere suspicion, however strong, cannot justify a finding of guilty."

This Court has said, "it is well established that '[t]hrough a process of logical deduction, the state may prove guilt from an established circumstantial fact through a series of inferences.'" *State v. Kaba*, 798 A.2d 383, 398 (R.I.2002) (quoting *State v. Dame*, 560 A.2d 330, 334 (R.I. 1989)). "However, '[i]f [the] pyramiding of inferences becomes speculative[,] [then] proof of guilt beyond a reasonable doubt will not be found.'" *State v. Berroa*, 6 A.3d 1095, 1104 (R.I.2010) (quoting *Kaba*, 798 A.2d at 398). "We have recognized that pyramiding of inferences becomes speculative when the initial inference rests upon an ambiguous fact that may support other inferences which are clearly inconsistent with guilt." *Dame*, 560 A.2d at 334.

Upon reviewing the jury instructions, we are of the opinion that the trial justice did not err in denying defendants' request for an inference instruction worded in a particular manner because the trial justice correctly stated, and fairly covered, the applicable law in his instructions. *See Imbruglia*, 913 A.2d at 1030; *Price*, 706 A.2d at 934. The trial justice explained the proper basis on which a jury may develop and rely on an inference and even provided a clear example of such. He also repeatedly explained that the appropriate standard of proof in this case was proof beyond a reasonable doubt, and he instructed the jury that mere suspicion, however strong, could not sustain a ver-

dict of guilty. Mr. Cipriano argues that, as in *In re Derek*, 448 A.2d at 768–69, "the present case consisted essentially entirely upon circumstantial evidence," and thus it required jury instructions about pyramiding of inferences and analyzing circumstantial evidence. We disagree. Ms. Nicoletti provided direct testimony implicating both defendants, making this case clearly distinguishable from *In re Derek*, and making the requested instructions unnecessary.

### 3. Reasonable Doubt

Both defendants further argue that the trial justice made an error in his jury charge concerning proof beyond a reasonable doubt, and that he failed to adequately correct the error.

The issue at hand first arose during closing arguments, when Ms. Bryant's defense counsel stated that proof beyond a reasonable doubt was a higher standard than proof by clear and convincing evidence. At the end of the counsel's closing argument, the trial justice stated that "[defense counsel] misspoke. He said clear and convincing proof is a higher standard than beyond a reasonable doubt. I'll instruct you of that at the end of the case."

When instructing the jury, the trial justice explained that defendants enjoy a presumption of innocence until a jury finds them guilty beyond a reasonable doubt. The trial justice stated that the burden of proof is on the state, and repeatedly indicated that the burden is proof beyond a reasonable doubt. The trial justice then proceeded to clearly and thoroughly explain what proof beyond a reasonable doubt entails.[12] The trial justice then noted:

"If in this case, as we have talked about from the very beginning and, in every criminal case, if you are to find the defendant or

12. The trial justice instructed the jury about reasonable doubt as follows:

"[As] I cautioned you earlier, * * * [defense counsel] in his argument made a misstatement when he talked about clear and convincing. Clear and convincing is a form of evidence that is higher than reasonable doubt. You're not asked to prove anything in this case by clear and convincing evidence. The standard is slightly less. It's beyond a reasonable doubt as I have defined that. So [defense counsel] misspoke in arguing to you."

Before the conclusion of the jury instructions, the trial justice again explained that the state must overcome the presumption of innocence and prove defendants' guilt beyond a reasonable doubt.

Following the instructions, at a sidebar conference, defense counsel objected to "[t]he clear and convincing issue." The trial justice responded: "I know what [the standard] is in the Superior Court. That is how I explained it." The jury then was excused for deliberation. Later that same day, however, the jury was escorted back into the courtroom, and the trial justice proceeded to inform the jury that:

"[I]t has been called to my attention that I made an error not so much in my instructions. Everything I instructed you about on the substantive law and upon reasonable doubt is correct. But you might remember that I corrected [defense counsel], and I indicated to you that clear and convincing was a higher standard than beyond a reasonable doubt. I was wrong, and he was right, and I apologize to him for that. He mentioned that in his argument, and I mentioned it again in my instructions to you.

"I simply made a mistake. It is the highest standard of civil litigation that which is not part of this case. You must still prove any and all elements of the charges against each defendant beyond reasonable doubt as I have defined that to you. So I certainly hope I haven't

---

either defendant guilty, the [s]tate must prove the guilt of each defendant of each crime charged in the information beyond a reasonable doubt * * *.

"You will notice I said proof beyond a reasonable doubt. I didn't say to you proof beyond all doubt. It is virtually impossible to prove anything beyond all doubt. Remember, the defendant, each defendant in this case, is not required to prove his or her innocence nor is a defendant required to offer any evidence of any kind nor to disprove or explain anything.

"Now, as I said, proof beyond a reasonable doubt does not mean proof beyond all doubt. It does not mean proof beyond all possible doubt. It does not mean that the [s]tate must prove the essential elements of a charge beyond a shadow of a doubt. It doesn't mean that. To be that convinced we would have had to have been an eyewitness to events like this.

"However, a reasonable doubt is a doubt that is based on the evidence that has been placed before you or a lack of evidence. Lack of evidence may give rise to reasonable doubt. A reasonable doubt, however, is not a fanciful or possible or speculative doubt. It must be more than that. A reasonable doubt is a doubt founded on reason and not doubt arising out of whimsy or caprice. Proof beyond a reasonable doubt exists when after you have thoroughly and conscientiously considered and examined all of the evidence that has been presented before you, your mind is left in such a condition that you feel an abiding conviction of the correctness of the charge made by the [s]tate that the defendant is guilty of the charge.

"To put it another way, if after you have carefully reviewed and considered all of the evidence in this case you are convinced that the defendant did, in fact, do the acts charged by the [s]tate, then proof beyond a reasonable doubt has probably been established. Mere suspicion, however strong, cannot sustain or justify a verdict of guilty. Simply stated, the law provides that the defendant is entitled to the benefit of every reasonable doubt arising out of the evidence or the lack of evidence. However, each defendant is not entitled to the benefit of any and all doubt."

caused any confusion, but I hope that clears it up. The standard is beyond a reasonable doubt as I have defined that to you.

"My remarks regarding the standard of clear and convincing w[ere] in error so just disregard that, and if you remember what [defense counsel] argued, you may take that under advisement for whatever that is worth to you, but it is not involved in the standard of proof necessary in this case. I apologize for that. Okay. Thank you."

Neither party objected to this, and the trial justice proceeded to discharge the jury to resume deliberations.

■■ By failing to object to the trial justice's clarification, defendants have not properly preserved this issue for appellate review. *See State v. Cotty*, 899 A.2d 482, 497 (R.I.2006) (holding that a defendant did not properly preserve an issue for appeal when he failed to restate his objection on the record following the trial justice's supplemental charge to the jury). Nevertheless, we will address the propriety of the trial justice's instructions.

It is our considered opinion that the trial justice in this case adequately instructed the jury concerning reasonable doubt. Although we acknowledge that the trial justice made an incorrect statement when he told the jury that "[c]lear and convincing is a form of evidence that is higher than reasonable doubt," we observe that this statement followed a long, thorough, and cogent explanation of reasonable doubt, and that the trial justice repeatedly explained that proof beyond a reasonable doubt was indeed the applicable standard. Furthermore, upon soon realizing his misstatement, the trial justice called the jury back from deliberations and proceeded to explain his error, apologize, and instruct the jury to apply the reasonable-doubt standard as he had otherwise correctly defined it for them. We do not believe that such a misstatement, which quickly was clarified, renders the instruction inadequate or improper, and we accordingly are satisfied that the trial justice's jury instructions concerning reasonable doubt were not erroneous.

## C

### Motion to Pass

■■ On appeal, Mr. Cipriano additionally argues that the trial justice erred in denying his motion to pass the case after a state's witness testified, while in shackles, that she had last seen Mr. Cipriano "on the bus" that morning. Mr. Cipriano contends that this testimony was prejudicial because it revealed that he was incarcerated at the time of trial and because it left the jury to "impermissibly infer that the defendant may have had a general criminal disposition."

More specifically, Mr. Cipriano takes issue with the following dialogue that occurred during the state's examination of Ms. Carroll:

"[State:] Okay. Be careful. I'm going to ask you another question. Listen carefully to the question. When was the last time you spoke to [Mr.] Cipriano?

"[Defense Counsel]: Objection, Your Honor. Can we approach side bar on this?

"THE COURT: No. Overruled. She can answer.

"[State:] I'm not asking you where just tell me when?

"[Ms. Carroll:] Before I got arrested.

"[State:] Are you telling me that you have not spoken to [Mr.] Cipriano since you were arrested?

"[Ms. Carroll:] I haven't seen him.

" * * * *

"[State:] You didn't speak to [Mr.] Cipriano today?

"[Ms. Carroll:] Oh—oh, yes. I'm sorry. I did.

"[State:] You forgot that?

"[Ms. Carroll:] No, I didn't know what you meant. *I saw him quick on the bus.*

" * * *

"[Defense Counsel]: Objection, Your Honor." (Emphasis added.)

Following this exchange, a sidebar conference was held at which Mr. Cipriano's counsel expressed disagreement with the testimony about the bus, explaining that he did not want the jury to know that defendant was incarcerated. The trial justice noted that he was "sitting right next to [Ms. Carroll]" and that he had not heard her say that she was on the bus with defendant. The trial justice subsequently, however, observed that the stenographer did hear Ms. Carroll say "on the bus" under her breath. Based on this statement, Mr. Cipriano moved to pass the case.

After reviewing the transcript over a break, the trial justice denied the motion to pass. He again commented that he had not even heard the word "bus," and he recalled that "everybody was practically talking at once." The trial justice then, however, offered:

"If the defense thinks it's helpful, I will be happy to make a curative instruction that the defendant was held for lack of bail and anything else you would like to that is reasonable and consistent with that. I think, and it's up to you, I would think that the fact that was all that was said and not very audible [o]ught to satisfy people but that is up to you."

In response, Mr. Cipriano's counsel stated that a curative instruction would "only make it worse," and the trial justice accordingly did not issue such.

▬▬▬ "We consistently have held that 'a trial justice's decision on a motion to pass the case is addressed to the sound discretion of the trial justice, and this Court will not disturb the ruling on such a motion absent an abuse of discretion.'" *Gautier,* 950 A.2d at 417 (quoting *State v. Bolduc,* 822 A.2d 184, 186 (R.I.2003)). "We accord the trial justice's determination great deference because 'he or she possesses a front-row seat at the trial and can best determine the effect of the improvident remarks upon the jury.'" *State v. Pacheco,* 763 A.2d 971, 979 (R.I.2001) (quoting *State v. Figueroa,* 673 A.2d 1084, 1091 (R.I.1996)) (internal quotation marks omitted). When ruling on a motion to pass, the trial justice must assess the prejudicial impact of the statement in question on the jury and "determine whether the evidence was of such a nature as to cause the jurors to become so inflamed that their attention was distracted from the issues submitted to them." *State v. Brown,* 619 A.2d 828, 831 (R.I.1993); *accord State v. Brown,* 9 A.3d 1232, 1239 (R.I.2010); *Gautier,* 950 A.2d at 417. "We previously have held that even prejudicial remarks do not necessarily require the granting of a motion to pass." *Brown,* 9 A.3d at 1239.

Mr. Cipriano argues that the trial justice should have granted the motion to pass because the statement in question was prejudicial and because a curative instruction would have been "ineffective." After reviewing the trial record, we believe that the trial justice did not abuse his discretion by denying defendant's motion to pass. The trial justice cautiously declined to rule on the motion until after he was able to review the transcript over a break, and, upon denying the motion, he offered to give a curative instruction to defray any potential prejudice. Furthermore, we agree with the trial justice that a mere reference to seeing defendant "on the

bus," which the trial justice described as being "not very audible," was not prejudicial enough to warrant an outright declaration of a mistrial. Accordingly, we conclude that the trial justice did not abuse his discretion by denying the motion to pass the case.

 Mr. Cipriano further argues that the trial justice had a duty to at least give a curative instruction following the prejudicial statement, and that his failure to do so constitutes reversible error. To support his argument, defendant refers to a previous statement by this Court, that "the trial justice has a duty, if at all possible, to attempt to 'free the evidence from such [harmfulness] * * * with [a] proper warning to the jury.'" *State v. Coleman,* 909 A.2d 929, 936 (R.I.2006) (quoting *State v. Brown,* 528 A.2d 1098, 1103 (R.I.1987)). The trial justice in the instant case was willing to give a curative instruction and he clearly offered such to defendant. The defendant's counsel, however, declined the offer for strategic reasons, explaining that it would "only make it worse." The defendant may not now argue that the trial justice was at fault for abiding by defense counsel's strategic decision to decline the curative instruction. *See Belanger v. Silva,* 120 R.I. 19, 24, 384 A.2d 605, 609 (1978) (refusing to allow a defendant to renege on his counsel's trial strategy and argue that the trial justice erred in failing to give a cautionary instruction when the trial justice had indeed offered such and defense counsel had requested that it not be given). We are satisfied that the trial justice did not err by not giving a curative instruction. *See State v. Martinez,* 624 A.2d 291, 295 (R.I.1993) (holding that a trial justice did not abuse his discretion in denying a defendant's motion to pass after the trial justice offered to give a curative instruction, but the defendant declined such for strategic reasons).

**D**

**Motion for a New Trial**

 Finally, Mr. Cipriano argues on appeal that the trial justice erred in denying the motion for a new trial because the verdict "is contrary to law[,] and is against a fair preponderance of the evidence, and fails to do substantial justice."

 "When deciding a motion for a new trial, 'the trial justice acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence.'" *State v. Prout,* 996 A.2d 641, 645 (R.I.2010) (quoting *State v. Bergevine,* 942 A.2d 974, 981 (R.I.2008)). "If, after conducting this independent review, the trial justice agrees with the jury's verdict or if the evidence is such that reasonable minds could differ as to the outcome, the motion for a new trial should be denied." *Bergevine,* 942 A.2d at 981 (quoting *State v. Gomez,* 848 A.2d 221, 234 (R.I.2004)). "If, however, 'the trial justice finds that the state has failed to sustain its burden of proof, a new trial must be ordered.'" *Id.* (quoting *Gomez,* 848 A.2d at 234). "This Court's review of a trial justice's decision on a motion for a new trial is deferential." *Prout,* 996 A.2d at 645. If the trial justice has articulated adequate grounds for denying the motion, his or her decision is entitled to great weight and will not be overturned by this Court unless he or she has overlooked or misconceived material evidence or was otherwise clearly wrong. *Id.* at 646; *Gomez,* 848 A.2d at 234.

Upon review of the record, we are satisfied that the trial justice did not overlook or misconceive any material evidence and that he did not err in denying the motion for a new trial. At a hearing held on the motion for a new trial, the trial justice recited the proper standard to be applied,

acknowledging that he was to conduct an independent assessment of the credibility of the witnesses and the weight of the evidence. He noted that this case involved "a tremendous number of witnesses," the "seminal witness" being Ms. Nicoletti. He explained that Ms. Nicoletti's criminal record had been exposed to the jury, that she took the stand and admitted to her record, and that the jurors were informed that they could consider her record in assessing her credibility. The trial justice proceeded to explain that he found Ms. Nicoletti's testimony to be "quite compelling"; he found her demeanor on the stand to be "quite remarkable" and "believable," and he observed that she "answered the questions forthrightly." He also found the testimony of the various police officers to be "quite compelling" and explained that their testimony corroborated Ms. Nicoletti's testimony. In contrast, the trial justice stated that he believed Mr. Cipriano had perjured himself and "was less than forthcoming in his testimony before the Court."

The trial justice also thoroughly summarized the relevant evidence presented at trial, particularly noting Ms. Nicoletti's testimony detailing how she stole and the testimony recounting the extensive and collaborative police surveillance. The trial justice stated that: "[this] was definitely a case upon which reasonable minds could differ. The jury unanimously and I think conscientiously took the time to look at the evidence in this case and came back with a unanimous verdict of guilty." The trial justice concluded that overall, "this was a very, very strong case presented by the [s]tate" and that the verdict was "more than adequately supported by the credible evidence." The trial justice accordingly denied the motion for a new trial.

■ On appeal, the defendant argues that the trial justice erred in denying the

motion for a new trial specifically because "[t]he only evidence suggesting that the items at Mr. Cipriano's home were stolen, and that he had participated in a conspiracy to commit larceny, came from the testimony of [Ms.] Nicoletti, who was simply not credible." The trial justice here clearly articulated that he found Ms. Nicoletti to be credible and that he believed Mr. Cipriano had lied during his testimony. The fact that the defendant may disagree with these credibility determinations is not a sufficient basis to warrant the granting of a motion for a new trial. *See State v. Rivera*, 987 A.2d 887, 903 (R.I.2010). Furthermore, the trial justice summarized the essential evidence, beyond just Ms. Nicoletti's testimony, and indeed articulated adequate rationale for denying the defendant's motion for a new trial. Thus, we are fully satisfied that the trial justice did not err in declining to grant a new trial.

### III

### Conclusion

For the reasons stated in this opinion, we affirm the judgments of conviction in all respects. The record shall be remanded to the Superior Court.